OSCAR PATIENT *et al.*, Plaintiffs-Appellants, *v.* ROBERT STIEF *et al.*, Defendants-Appellees.

Fifth District   No. 76-102

Opinion filed June 3, 1977.

Buchmiller & March, Ltd., of Greenville, for appellants.

H. Carl Runge, Jr., of East St. Louis, and John W. Kelsey, of Greenville, for appellees.

Mr. JUSTICE KARNS delivered the opinion of the court:

Plaintiffs, Oscar and Grace Patient, brought an action against defendants, Robert and Ruth Stief, in the Circuit Court of Bond County seeking to enjoin them from entering upon property to which plaintiffs claimed title by adverse possession. Plaintiffs also sought to quiet their

title to the disputed property. After a bench trial, the court entered an order denying the relief sought by plaintiffs. This appeal followed.

Gladys and Claud Smith, on behalf of Grace B. Kelly, also filed suit against defendants. As indicated on the diagram reproduced below,[1] Mrs.

---

[1] The diagram is basically a reproduction of a plat of survey prepared for defendants by Aurther Sheathelm, a licensed surveyor. The shaded areas on the diagram are not drawn to any particular scale. We have added them for illustrative purposes only.

Kelly owns the property which abuts the southern border of defendants' land. The Smiths' complaint alleged that Mrs. Kelly owned all of the land south of the gravel road appearing at the bottom of the diagram. Defendants contended, however, that the border between their property and Mrs. Kelly's was south of the gravel road. The Smiths' case was tried at the same time as plaintiffs'. The trial court subsequently entered judgment in the Smiths' favor, holding that Mrs. Kelly had gained title to the shaded area at the bottom of the diagram by adverse possession. Defendants did not appeal from that judgment, and it is not directly involved in the case at bar. Nevertheless, it will be necessary in this opinion to refer to the Smiths' action against defendants.

The parties to this action are adjoining landowners; at issue is the location of the boundary line separating their properties.

Plaintiffs are the record owners of blocks five, eight and 11 in Hugh's First South Addition to the Town of Woburn (Hugh's First Addition). The official plat of Hugh's First Addition, filed in 1838, indicates that each of these blocks is divided into four 50′ x 99′ lots. The description of defendants' property depends upon an unrecorded and, apparently, nonexistent plat of Hugh's *Second* Addition to the Town of Woburn. It is, therefore, of no value in resolving this case.

Plaintiffs contend that the southern boundary of their property is a tree line, represented by the dotted line on the diagram, which marks the northern border of what was once an alley. Defendants argue, however, that the boundary is located north of the tree line, at the point represented on the diagram by the heavy black line. The area of land involved in this dispute is trapezoidal in shape. It measures 198 feet on its northern side, 61.5 feet on its western side and 48.5 feet on its eastern side. The length of its southern side (the tree line) does not appear in the record. Its area is approximately 10,900 square feet, or about one-fourth of an acre.

Defendants established the northern boundary of their property by a survey prepared in 1973 by Aurther Sheathelm. In the absence of the plat of Hugh's Second Addition, Sheathelm surveyed plaintiffs' property and assumed that defendants owned whatever, according to the survey, plaintiffs did not own. The descriptions of plaintiffs' property and of the Town of Woburn are not tied to a monument or marker established by any Federal survey. Sheathelm, however, located an iron pin which he assumed was properly placed at the northwestern corner of block two in Hugh's First Addition. He then determined the northeastern corner of block two through the results of an earlier survey by which he had established the width of Main Street, which fronts the northern side of block two. In making this earlier survey, Sheathelm relied upon several fence lines, one of which ran east and west on the northern side of block one of the Town of Woburn. Sheathelm stated at trial that these fences

appeared to be 50 to 70 years old. He also testified, however, that none of the area residents with whom he spoke could tell him if the fences were located on property lines. After determining the two northern corners of block two, Sheathelm measured off the distances called for in the plat of Hugh's First Addition and located what defendants now insist is the correct southern border of plaintiffs' property.

Plaintiffs argue that the survey conducted by Aurther Sheathelm is unreliable because he failed to tie it to a federally established corner.[2] In support of this contention, they cite *Westgate v. Ohlmacher*, 251 Ill. 538, 96 N.E. 518 (1911). In *Westgate*, plaintiff contended that three separate surveys of block 15 in the city of Sycamore established that a structure built by defendant encroached upon a 10-inch strip of plaintiff's land. Each of the surveys was begun at the northwestern corner of a building presumably located near the northwestern corner of block 15. At trial, however, none of the surveyors could state whether or not the point from which the surveys were started corresponded with the corner of block 15. The supreme court, therefore, held that the surveys were too unreliable to warrant a change in the already established boundary line and affirmed a judgment against the plaintiff. The court noted that:

> "In case of a disputed boundary line in a town, city or village, where the monument from which the town, city or village was platted is lost or destroyed, the courts ought not to disturb boundary lines between lot owners which have been acquiesced in for years and upon which the lot owners have erected improvements, upon uncertain evidence, or upon the mere conjecture of a surveyor or a number of surveyors * * *." 251 Ill. 538, 541, 96 N.E. 518, 519.

Later in its opinion, the court quoted with approval the following statement made by Justice Cooley in a similar case:

> " ' * * * Nothing is better understood than that few of our early plats will stand the test of a careful and accurate survey without disclosing errors. This is as true of the government surveys as of any others, and if all the lines were now subject to correction on

---

[2] Plaintiffs state in their brief that Sheathelm "totally failed to establish any known governmental monument by acceptable methods accepting only the hearsay of an unnamed highway commissioner."

At trial, Sheathelm testified that a highway commissioner told him where to find a stone monument which marked the northwestern corner of section 19, Township six north, Range two west of the third principal meridian. After finding the stone, Sheathelm relied upon it to reestablish the northwestern corner of section 20, within which all of the property involved in this case is located. Sheathelm's further testimony, however, makes it clear tha the relied upon the northwestern corner of section 20 only in conducting a separate survey of Grace B. Kelly's land in order to establish the *southern* border of defendants' property. Because the location of the section corner had no bearing on his survey of plaintiffs' land, we need not consider whether Sheathelm's reliance on the highway commissioner's statement was an acceptable procedure.

new surveys, the confusion of lines and titles that would follow would cause consternation in many communities. Indeed, the mischiefs that must follow would be simply incalculable, and the visitation of the surveyor might well be set down as a great public calamity.' " 251 Ill. 538, 542, 96 N.E. 518, 519-20.

■■ We agree with the general principles expressed by the supreme court in *Westgate*, but do not find them to be controlling in the case at bar. The surveyors in *Westgate*, apparently, had no idea whether the starting point of their surveys was accurately located. Here, however, Aurther Sheathelm testified that the points from which he began his survey were, in fact, the northwestern and northeastern corners of block two in Hugh's First Addition. He also explained why he had reached that conclusion. We feel that it was for the trial court, as the trier of fact, to determine whether Aurther Sheathelm's survey was accurate as a factual determination. See *Kandlik v. Hudek*, 365 Ill. 292, 6 N.E.2d 196 (1936) (location of boundary line is generally a question of fact).

Assuming, *arguendo*, that Sheathelm's survey was correct, plaintiffs contend that they have clearly established title to all of the land north of the aforementioned tree line by adverse possession and that the trial court's decision to the contrary is against the manifest weight of the evidence. We agree.

■■ Adverse possession includes five elements. It must be hostile or adverse; actual; visible, notorious and exclusive; continuous; and under claim of ownership. The party asserting adverse possession as a bar to legal title has the burden of proving that the foregoing elements have existed for a period of 20 years or more. In addition, he must prove, by clear and unequivocal evidence, the location of the boundaries he claims. Such boundaries must be definitely established at the inception, during the continuance, and at the completion of the period of adverse possession. *Cannella v. Doran*, 21 Ill. 2d 514, 173 N.E.2d 512 (1961); *Schwartz v. Piper*, 4 Ill. 2d 488, 122 N.E.2d 535 (1954); *Bridges v. Neighbors*, 32 Ill. App. 3d 704, 336 N.E.2d 233 (5th Dist. 1975); Ill. Rev. Stat. 1975, ch. 83, par. 1.

At trial, 10 witnesses were called by plaintiff and testified that the tree line was located at the northern border of an alley which once cut east and west across the property involved in this dispute. The combined testimony of these witnesses covered an approximate total of 65 years as one witness remembered that the alley existed in 1910. Recent photographs of the tree line were introduced at trial. These show that the alley has been traveled infrequently at most in recent years, for its path is overgrown with grass and other vegetation. Two of plaintiffs' witnesses, however, stated that as recently as 1962 the alley showed signs of wear.

Plaintiffs' witnesses testified, in substance, that the southern boundary

of plaintiffs' land had always been considered the northern side of the alley and that plaintiffs' and defendants' predecessors, in title and possession, as well as the plaintiffs themselves, had always maintained their yards accordingly. For instance, Jack Durr, defendants' immediate predecessor in interest, stated that he had always assumed that the alley was the northern border of his property, that he had maintained his yard to that line, and that he had pointed this out to defendants when they purchased the land.

Most of plaintiffs' witnesses remembered that the alley had once been fenced on both sides, although their testimony varied somewhat concerning when these fences had been removed. However, Dave Banks, who lived on the land now owned by plaintiffs from 1934 to 1946 or 1948, testified that there were fences on both sides of the alley during his entire period of residency. Another witness, Dale Durr, stated that there were fences on either side of the alley at least "from Adam and Eve forward to 1948." Gale Harris, who sold plaintiffs' property to them in 1969, testified that there was an old fence on the northern side of the alley when he purchased the property in 1957, and that he removed it in 1960.

■■ ■ We feel that the foregoing evidence, which was virtually uncontradicted at trial, was sufficient to establish all of the elements of adverse possession and, hence, plaintiffs' title to the disputed area of land. (See *Wyatt v. Myers*, 26 Ill. App. 3d 1086, 325 N.E.2d 620 (4th Dist. 1975).) A fence is notice of actual occupancy sufficient to create the bar of the statute of limitations (*Ewald v. Horenberger*, 37 Ill. App. 3d 348, 345 N.E.2d 524 (2d Dist. 1976)), and the land north of the alley in this case was enclosed by a fence at least from 1934 until 1960, well over 20 years. From 1960, when the fence was removed, until 1973, when defendants asserted their alleged right of ownership, plaintiffs and their predecessor in interest continued to use and control all of the land up to the northern border of the alley, which is the ordinary way of asserting ownership. (*Guinzy v. Kratz*, 28 Ill. App. 3d 500, 328 N.E.2d 609 (5th Dist. 1975).) It is true that for many years prior to 1973 there was no dispute over the true location of the border. In order to establish a hostile claim, however, actual animosity need not exist between the party claiming adverse possession and the title holder. A good faith but mistaken belief by the possessor that he holds title is sufficient. *Ewald v. Horenberger.*

In entering judgment against plaintiffs, the trial court stated that:

> " * * *[T]here was considerable evidence that the area claimed to be the southerly boundary line of their property by the plaintiffs was used as an alley * * *. In this Court's view, this in no way would afford the owners of certain blocks of land to the north with a claim to subject property."

In making this statement, the court seems to have overlooked the

evidence indicating that plaintiffs and their predecessors in interest have actually occupied all of the land north of the tree line for more than 20 years.

■■ The trial court also noted, in entering judgment, that plaintiffs pay real estate taxes only on their three blocks in Hugh's First Addition and not on the additional land which they now claim. When a claim of adverse possession is made under the 20-year statute of limitations, however, nonpayment of real estate taxes is only one factor to be considered. (*Scales v. Mitchell*, 406 Ill. 130, 92 N.E.2d 665 (1950); *Wijas v. Clorfene*, 126 Ill. App. 2d 315, 262 N.E.2d 83 (1st Dist. 1970).) We do not feel that plaintiffs' failure to pay taxes in this case requires us to reject their otherwise strong showing of adverse possession. Moreover, the record does not indicate whether defendants have ever paid real estate taxes on the disputed area. The only evidence relevant to this question indicates that they have not.

For the reasons stated above, the decision of the Circuit Court of Bond County is reversed and the cause remanded, with directions to set aside the judgment in favor of defendants, and with further directions to enter a decree in favor of plaintiffs, quieting title to the premises described in their amended complaint.

Reversed and remanded, with directions.

CARTER, P. J., and JONES, J., concur.